Filed 3/23/16  P. v. Ellis CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>LEGRANTE ELLIS,<br><br>　　　Defendant and Appellant. | H040933<br>(Monterey County<br>Super. Ct. No. SS041497) |

LeGrante Ellis, who is serving an indeterminate life sentence, appeals from an order denying his petition to recall his sentence pursuant to Penal Code section 1170.126.[1]  Appellant contends:  (1) section 1170.126 creates a presumption that an eligible inmate is entitled to resentencing; (2) he was denied his right to a jury trial and proof beyond a reasonable doubt on the issue of dangerousness; (3) the definition of "unreasonable risk of danger to public safety" in Proposition 47 applies to the present case; (4) the court abused its discretion in finding that he posed an unreasonable risk of danger to public safety; and (5) the abstract of judgment does not accurately reflect his presentence credits.  We conclude that the abstract of judgment must be modified.  As modified, the judgment is affirmed.

---

[1]　All further statutory references are to the Penal Code unless otherwise stated.

## I.  Three Strikes Reform Act of 2012

The Three Strikes Reform Act of 2012 (Reform Act) amended sections 667 and 1170.12 and added section 1170.126.  (*People v. Superior Court (Martinez)* (2014) 225 Cal.App.4th 979, 984 (*Martinez*).)  Under the previous version of the "Three Strikes" law, a defendant who had been convicted of two or more serious or violent felonies was subject to an indeterminate life sentence of 25 years to life after his or her conviction of any new felony.  (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 177 (*Yearwood*).)  The Reform Act changed the Three Strikes law by reserving indeterminate life sentences for cases in which the new offense is also a serious or violent felony, unless the prosecutor pleads and proves an enumerated disqualifying factor.  (*Yearwood*, at p. 177.)  In all other cases, a recidivist defendant will be sentenced as a second strike offender instead of a third strike offender.  (*Id.* at pp. 167-168.)  The Reform Act also "created a postconviction release proceeding whereby a prisoner who is serving an indeterminate life sentence imposed pursuant to the three strikes law for a crime that is not a serious or violent felony and who is not disqualified, may have his or her sentence recalled and be sentenced as a second strike offender unless the court determines that resentencing would pose an unreasonable risk of danger to public safety.  (§ 1170.126.)"  (*Yearwood* at p. 168.)

## II.  Statement of the Case[2]

In January 2005, a jury found appellant guilty of three counts of commercial burglary (§ 459), two counts of fraudulent use of an access card (§ 484f, subd. (b)), and one count of attempted fraudulent use of an access card (§§ 484f, subd. (b), 664).  The jury found appellant not guilty of three counts of second degree robbery, one count of

---

[2]     This court has taken judicial notice of the record filed in case No. H029468.

attempted second degree robbery, two counts of commercial burglary, five counts of fraudulent use of an access card, and brandishing a firearm. Appellant admitted that he had three prior strike convictions and one prior serious felony conviction.

Following the denial of appellant's motion to dismiss his prior strike convictions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497(*Romero*), the trial court sentenced him to 25 years to life in state prison.

In February 2013, appellant petitioned to recall his sentence pursuant to section 1170.126. On October 4, 2013, the court heard testimony from appellant and argument from counsel. The court continued the matter and heard additional argument five days later. At the conclusion of that hearing, the court put the matter over for six months to provide the parties with the opportunity to present further evidence. In April 2014, the court denied appellant's petition for resentencing.

### III. Statement of Facts

### A. Commitment Offenses

At approximately 10:30 p.m. on April 16, 2004, a "well-built," light-skinned African-American man, who was about six feet tall, approached Paul Breslin-Kessler, his wife Carina, and their daughter on a bike path in Pacific Grove. The man pointed a gun at Paul and told him to "get down." After Paul complied, the man told Carina and the girl to "get back." The man told Paul to empty his pockets. As Paul began to comply, the man said, "Come on, Mike, empty your pockets." Paul replied that he was not Mike and he had nothing in his pockets except his car keys. The man asked, "You're not Mike?" He paused, said, "Sorry, man," and walked away. The family left and called 911.

At trial, Paul was unable to identify appellant as the man who had tried to rob him. According to Paul, appellant had "similar characteristics" to the robber. Both had "high cheekbones," and were "well-built and strong," but appellant was taller, darker-skinned,

3

and had a "much more broad" nose. Though Carina testified at trial, she was not asked to identify whether appellant was the man who attempted to rob Paul.

At about 11:45 p.m. on April 17, 2004, Christopher Covino, Ellen Flaxman-Covino, and Allison Creeden were walking in Monterey when an African-American man, who was about six feet tall and wearing baggy clothes, approached them. The man was holding a gun and told them to "get down," and threatened to shoot Covino if he did not comply. After all three people got to the ground, the man said to Covino, "Look away, or I'm going to shoot you." The man took Covino's wallet and the women's purses. A driver in a passing car called 911 a minute or two after the robbery.

Flaxman-Covino testified that appellant did not look familiar to her. Though they testified at trial, neither Covino nor Creeden were asked whether appellant was the man who had robbed them.

Shortly before midnight on April 17, 2004, a regular customer at Ord Terrace Liquors made two credit card purchases. The customer was an African-American man, who weighed approximately 200 pounds and was about six feet two inches tall. One of the purchases was made with Flaxman-Covino's credit card and the other was made with Covino's credit card. The store cashier did not identify appellant at trial as the customer.

At about 12:30 a.m. on April 18, 2004, one of Covino's credit cards was used to make a purchase inside Alliance Mart in Monterey. This card was also used to purchase gas at the pump outside. One of Flaxman-Covino's credit cards was used at about the same time to purchase gas at the same station. The store manager, who was on duty at that time, was not asked to describe who had used those cards or identify whether appellant used either of them.

On April 18, 2004, appellant drove to Gilroy with Terri Lynn Wheeler. At about 10:30 a.m., they entered a Nike store and appellant purchased some items with one of Flaxman-Covino's credit cards. About half an hour later, appellant and Wheeler entered

4

a DKNY store and appellant purchased some items with one of Flaxman-Covino's credit cards. At about noon, appellant and Wheeler went to a Super 8 Motel to rent a room. Appellant gave Flaxman-Covino's credit card to the clerk. When the clerk was unable to obtain authorization, appellant and Wheeler left the motel.

Several calls were made on Creeden's cell phone, which had been in her purse when it was taken. The calls were made to people who either knew appellant or Wheeler.

On May 5, 2004, appellant was arrested. Appellant told a police officer that he had given two rocks of cocaine to a man named "Slim" at the Alliance Mart in Monterey in exchange for four credit cards. Appellant described "Slim" as wearing baggy clothing and slightly shorter and thinner than he was. Appellant also stated that he went shopping with Wheeler the day after he obtained the credit cards. Appellant admitted that he had used the credit cards, but denied that he had committed the robberies.

## B. Prior Strike Offenses

At about 10:00 p.m. on March 31, 1992, appellant approached two teenagers and asked them for "a smoke." He then pulled out a .9 millimeter pellet gun and said, "I want your money." He took $30.00 from one of the victims, but the other had no money. While appellant pointed the pellet gun at the victims, he asked an accomplice, "Should I do 'em, should I do 'em?" When his accomplice shook his head, appellant said, "Get outta here you fags." The victims left.

About four hours later, appellant and an accomplice approached another victim and asked for a ride. The victim agreed and the men got into back seat of the car. As they were driving from the area, appellant produced a gun, placed it against the victim's head, and demanded money. The victim threw his wallet onto the back seat, pushed the gun away, rapidly accelerated the car, opened his car door, and jumped out. The victim injured his back and knees and experienced symptoms of posttraumatic stress disorder.

5

The accomplice climbed into the driver's seat and drove away. The victim's vehicle was located about an hour later.

## C. Appellant's Criminal History

Appellant's criminal history is extensive. In August 1984, he was convicted of disturbing the peace. In March 1986, he was convicted of resisting arrest. In July 1987, he was convicted of possession of a switch-blade knife. In December 1987, he was convicted of resisting arrest. In July 1990, he was convicted of child endangerment. Less than a year later, his probation was revoked. In January 1991, he was convicted of a felony theft. Appellant was placed on probation, but he failed to attend counseling and a substance abuse counseling program. Though appellant requested a referral to a residential substance abuse treatment program, he failed to participate in the program.

In 1992, appellant committed the Three Strikes offenses. He was sentenced to five years and eight months in state prison. Appellant was convicted of a theft offense in 1995 and served seven months in jail in Arizona. Appellant violated his parole once in 1996 and three times in 1999.

In 1999, appellant was convicted of felony drug possession. His motion to strike the strike prior convictions was granted and he was placed on felony probation for three years. However, his probation was revoked in 2000 when he committed a new offense. Appellant failed to appear and a bench warrant was issued in August 2000. When appellant was arrested in May 2001, he admitted the probation violation.

In 2000, appellant was convicted of driving under the influence of alcohol and placed on probation for five years. His probation was revoked several times. In 2000, appellant was also convicted of driving with a suspended license. In 2003, he was convicted of driving without a valid license and possession of drug paraphernalia. He was placed on probation for three years.

6

In January 2004, appellant was convicted of drunk driving with a prior conviction. Though he was ordered to attend the multiple offender alcohol program, he failed to complete the program.

In February 2004, appellant was convicted of felony drug possession. The trial court struck his prior strike convictions. Appellant was on felony probation for that offense when he committed the current offenses.

### D. Appellant's Performance in Prison

In May 2006, appellant completed a 250-hour anger management class entitled Conflict/Anger: Lifelong Management Program (CALM program). Approximately four months later, appellant completed an additional 250 hours of training in the CALM program to become a certified facilitator.

In January through March 2008, appellant participated in Alcoholics Anonymous (AA) weekly meetings. In February 2008, appellant completed the anger management curriculum in the Balanced Reentry Activity Group (BRAG). Three months later, he became a facilitator in BRAG's programs and classes. In April and July 2009, appellant received commendations for his administration of these programs. Appellant also acted as a facilitator for several self-help groups, including the anger management program at the time of his resentencing hearing.

Appellant regularly attended Narcotics Anonymous (NA) and AA meetings beginning in October 2011 through his resentencing hearing.

In February 2014, appellant completed the Comprehensive Relapse Prevention Plan and the Extensive Relapse Prevention Plan. He was also enrolled in an alcohol and drugs studies program which was offered through Palo Verde College.

Appellant took classes through the Valley Adult School. In 2013, he received his Associate of Arts degree in social and behavioral science from Coastline Community

College.  He was 13 units short of obtaining his Bachelor's degree in sociology. Appellant has served as a tutor for other inmates for several years.

Appellant completed other programs through BRAG, Christian religious programs, a vocational class, classes through the Federal Emergency Management Agency, and other classes in work and life skills.  In 2007, appellant started a veteran's support group, which helped veterans adjust to prison.  During 2009, appellant also worked as a law clerk.

As to disciplinary issues in prison, appellant had two infractions.  In 2007, he became "loud, argumentative, disruptive, and confrontational" when he was told that he was required to fill out a request form and needed to see a doctor in order to receive ice treatment.  He did not make any threats, but he disobeyed an order to leave the clinic.  In 2011, appellant was signed up for a telephone call during his assigned work hours.  When a correctional officer told him that inmates were not allowed to sign up for phone calls during their assigned work hours, appellant became "agitated and argumentative" and repeatedly refused orders to stop arguing and return to his assigned housing.  Appellant was counseled by other staff and the issue was resolved.

In 2009, a minister opined that appellant was "more than suitable and [was] the perfect person for parole."  In 2013, a college coordinator believed that appellant's "education and work ethic [would] help him become a more productive member of his community upon reentry into society."  In the same year, a psychologist indicated that "his risk of recidivism [was] reduced by virtue of his age and extensive prison rehabilitation efforts."  In 2012, the formal assessment by California's Department of Correction and Rehabilitation (CDCR) found appellant to be at a "low risk to reoffend."

## E. Hearing on Petition for Resentencing

Appellant testified that his criminal history began in 1984 when he was 22 years old and returned home to discover his sister with a knife in her back. Since he had been drinking, he "didn't deal with [the police] really well" and he was charged with resisting arrest. After a foot injury ended his dream of playing professional basketball, he became very depressed, dropped out of school, began using drugs, and committed crimes. Appellant explained that he did not commit crimes "maliciously" and that all of his crimes were committed when he was under the influence of alcohol or drugs. He took responsibility for his crimes, but noted that drugs "took control" of him.

Appellant testified that he had been clean and sober for 3,437 days though he had access to drugs and alcohol in prison. In order to deal with pressures and stresses if he were to be released into the community, he pointed out that he was taking AA and NA classes. Appellant acknowledged that he had an anger problem and had enrolled in a program to address that problem. Appellant asserted that he was making better choices and was optimistic about his future.

At the time of the hearing, appellant was 50 years old. He testified that he understood that he had "to stay on track, to stay doing things that [he knew were] constructive, . . . positive, . . . family-oriented," and would help his community and society. In the event that his petition was granted, appellant's career goal was to work in an at-risk youth facility and he planned to live with his wife and family.

On cross-examination, appellant acknowledged that he had employment, the support of his family and friends, and a place to live before he was sentenced to life in prison. Appellant also conceded that he was given some opportunities to address his drug addiction, but he was not ready to get help on those occasions. Even after his prior strike convictions were stricken in 1999 and 2004 and the trial court did not sentence him to life in prison, appellant testified that he continued to use drugs. Appellant claimed that he

9

was only given one opportunity to enter a federal drug program, but conceded that he might not recall other opportunities because he was under the influence of drugs and alcohol.

Appellant initially maintained that he was never directed to an alcohol program even though he was an alcoholic with two driving under the influence (DUI) convictions. However, he then testified that he did complete a DUI program after his first DUI. He did not stop drinking, because his drinking was tied to his drug use. However, he did stop drinking and driving.

Regarding his prior strike convictions, appellant testified that they were committed on two consecutive days and he was under the influence of drugs and/or alcohol on both occasions. As to the first robbery, he was "high as a kite," and he made a "bad choice." At the time, he was waiting for a drug dealer and had money. He used a neighbor's toy gun, and he never meant to hurt anyone. He further claimed that even if it had been a real gun, he would not have used it. Appellant did not remember saying anything to instill fear in the victims.

As to the second robbery, appellant and his accomplice had not planned to commit a robbery, and he was shocked when his accomplice pulled out a gun. Appellant denied that he put a gun to the victim's head. However, appellant did not tell his accomplice to stop the robbery. He also did not stop the car to determine the victim's condition after he jumped from the car. At that time, appellant did not care if the victim was hurt, because he was under the influence of drugs and alcohol.

Appellant conceded that his addictions and difficulty with anger management were separate issues. In dealing with his anger, appellant had learned several tools, including breathing, hesitating before reacting, and walking away from a situation and trying to reconcile it later. He had some concerns about returning to the same neighborhood, but he no longer used drugs so he would not be associating with people who used drugs.

10

After the prosecutor pointed out that appellant had some anger management difficulties in prison long after he had said that he achieved sobriety, appellant denied that that his drug use was based on anger. He believed his drug use stemmed from depression and that drugs and alcohol helped him avoid thinking about subjects that depressed him.

Appellant did not think that he had anger issues, though he claimed that he could still learn better ways to manage his anger. He did not agree that the write-ups that he received for outbursts in prison indicated that he was unable to control himself. As for the incident in July 2011, he disputed that the write-up accurately reflected what had happened. As he "vaguely" remembered the conversation, one officer had signed him up to use a phone and another officer told him that he could not use the phone. They went "back and forth," and the issue was eventually resolved. As to the incident with the nurse in 2007, appellant conceded that he was argumentative. He tried to show the proper documentation to the nurse, and the nurse "snatched it and balled it up and threw it in the trash." Appellant responded, "You must be some kind of idiot for snatching paperwork out of a lifer's hand." Appellant claimed that he was not threatening the nurse, he was asking whether he was crazy. After the nurse told appellant to lie on the ground and he refused, guards were called. When appellant was able to show the document to the nurse, they resolved the matter.

After the prosecutor concluded her cross-examination, appellant explained that he "kind of got emotional" and "kind of came off defensive, and [he] didn't mean to." He "didn't want to be portrayed again as someone [he was] not." He acknowledged that there was a difference in his reactions to questions by defense counsel and those of the prosecutor. He explained that he viewed the prosecutor as "the enemy," and he did not "want to be presented in a way [he] was in the past."

The court noted for the record that "defendant has intermittently had emotional reactions that typically result in his eyes tearing and tears running down his face. That's

11

happened three or four times. And this particular moment, probably it was fifteen seconds before I started talking." Defendant explained: "It's hard. I know where I come from and I know what it took for me to get to this point. And I know that the drugs and the alcohol, when I was under the influence of them, I made some bad choices. I just want to move forward. I've paid back everything that I could give back, and I can't give no more. I just got to try to make amends and move forward. And I just want an opportunity to do that."

At the end of questioning, the court asked appellant why he was crying again. Appellant responded that he was scared. The court commented: "You took the stand crying and you're crying now. So, we've been in each other's presence for, you know, several hours -- or a couple of hours anyway. And it seems like you are wrapped tight." Appellant responded that he had come a long way and was afraid that the court would not see that. When the court asked how crying helped that, appellant stated, "I can't stop it." The court responded, "Well, that's the problem." The court also asked appellant, "How are you going to deal with things if they don't turn out like you hope?" Appellant acknowledged that everything was not going to turn out like he hoped and stated that he had contingency plans. Appellant noted that he had worked hard toward his goals for the last nine years. He further stated that he would deal with his depression by talking to his wife, his coach, his mother, and his pastor.

At the conclusion of appellant's testimony, the court noted that appellant had been acquitted of attempted robbery and three counts of robbery and asked him if he had committed those crimes. Appellant responded, "No, I did not."

## F. The Court's Ruling

Following argument, the court stated: "I would start off by taking a look at the prior strikes. The prior strikes are a series of robberies. And maybe a short series but

12

nevertheless a number of different people, including a minor, that were, for all intents and purposes, robbed at gunpoint. A family, . . . and they're a day apart. You don't see people jump [out of] moving cars too often, but you can understand that when you understand the background of that victim, which resulted in injury that I'm sure is something he still experiences today. I just -- the gratuitous violence. . . . [¶] The other factor that weighs heavily, I suppose, is the consistency -- when Mr. Ellis is not in an institutional environment, the consistency with which he is engaged in criminal conduct. He's unable to conform his conduct to the requirements of society. He's just not equipped. His adult life, except when he's in an institution, has been to lead a life of crime. [¶] You know, I look at the institutional environment and I really do appreciate the conduct of the defendant during his time there, but I -- I also assess it in the context -- well, I assess it also with the pressures that are facing him if he is not in an institution. And the pressures that face him if he's not in an institution are all the pressures that one has to encounter during life in society. [¶] And he will be confronted -- if he's freed, he will be confronted by authority, he will be confronted by peers that -- you know, it's not going to be a rosy thing. It's not going to be something that isn't easy. It's not an easy road when you get out after being in an institution for so long. Where do you go? What do you do? How have you prepared for re-entry into society? And that's just something that no one, I think, can prepare for very adequately. [¶] And then, I also take a look at how he conducted himself during the course of the hearing. He is an addict. There isn't any question about that. He is an addict, he's got a problem, and we recognize that addicts sometimes fall off the wagon. With Mr. Ellis we know that when this addict falls off the wagon that in all virtual likelihood someone is going to suffer as a result of it. Violence is going to occur as a result of it. [¶] You shake your head, Mr. Ellis, as I say that and yet I can't ignore the fact that you could not control your emotions in the courtroom when you were testifying. You just couldn't do it. [¶] So when the going

13

gets tough, and it will, then you're going to fall off the wagon and we're going to be back here. The best predictor -- I don't necessarily hold to this, but the best predictor of future conduct is what you've done historically. There's a lot of truth to that. It may not necessarily be the defining truth, but it certainly is something we can't ignore. [¶] And then your testimony. Seriously, what I gathered from your testimony, besides the fact that you were having this anger management issue when [the prosecutor] was cross-examining you -- and, you know, I sit there and I know the record is pretty bland when it comes to trying to determine whether or not -- what this tone of the questioning was and what the tone of the responses were and that sort of thing, you can't see that in black and white. [¶] [The prosecutor] is her usual -- and I'll make my own observations. [The prosecutor] when she cross-examined you, was her usual, professional, kind of low key demeanor, asking you questions. They were tough questions, but there was nothing in her tone, there was nothing in her -- the phrasing of the questions that challenged you, that was argumentative, and your -- and so, that was her tone and that was the nature of her presentation. [¶] Whereas you -- again, you can't tell tone from paper. You were angry. You were aggressive in responding to her. And -- and I think you actually described it best in your testimony. She was the enemy. That's -- I think that's the word you used, if I remember correctly. You regard her as the enemy. And it's an authority figure. [¶] And why [the prosecutor] -- I guess it's just the position that she plays. But there are going to be a lot of authority figures out there in the real world and I can't ignore that. I can't ignore how you reacted to this authority figure in assessing whether or not you're going to pose an unreasonable risk of danger to those authority figures and people around if you're let out. [¶] I think one of the ways I would characterize generally how you dealt with the questions and answers is that if something disagrees with you, you get pushy. You couldn't give any insight to what triggers -- what triggers cause you to blowup. [¶] You know, I know [the prosecutor] probably -- you know, she

14

suggests that I not consider the fact that I am convinced without question that you committed those robberies that you got acquitted of. I think I can, and I do consider them. And I also consider the fact how easy it was for you to just say no, I didn't do it, which is just lying under oath. That is the assessment of the Court, how easy it is for you to do that. [¶] And how do I ignore that? How do I ignore that you can look me in the eye, without flinching, and tell me you didn't do something I know you did? Well, these are the things that I have to evaluate, and I have. [¶] I think you minimize your conduct. I don't think you're able to control your emotions. I think you have done fairly well in a very structured institution. I think you can continue to do that, but I do find that you pose an unreasonable risk of danger and I decline to resentence you. [¶] Let's see how -- the Court finds that you do pose an unreasonable risk of danger to public safety based on all the factors and all the information that's been presented to the Court, and therefore the petition for resentencing is denied."

## IV. Discussion

### A. Statutory Presumption

In order to be eligible for resentencing as a second strike offender under the Reform Act, an inmate must satisfy the three criteria set forth in section 1170.126, subdivision (e). (*Martinez*, *supra*, 225 Cal.App.4th at pp. 988-989.) After an inmate has satisfied these criteria, he or she "*shall* be resentenced [as a second strike offender] *unless* the court, in its discretion, determines that resentencing the [inmate] would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f), italics added.)

Relying on *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn*), defendant contends that the use of "shall"/"unless" language of section 1170.126 creates a presumption that the court shall reduce a life-term to a second-strike sentence.

15

*Guinn* held that section 190.5 established a presumption of life without parole as the sentence for a 16- or 17-year-old who had been convicted of a special circumstance murder. (*Guinn, supra*, 28 Cal.App.4th at pp. 1141-1142.) Section 190.5 provides that the penalty "shall be confinement in the state prison for life without possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).) The California Supreme Court disapproved *Guinn* and disagreed with its holding that the language of section 190.5 established a presumption. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1371 (*Gutierrez*).) *Gutierrez* concluded that this statutory language was ambiguous and resolved the ambiguity by adopting a construction that rendered it constitutional. (*Id.* at pp. 1372-1373.)

Appellant claims that the structure of section 190.5 is similar to the structure of section 1170.126, subdivision (f) and thus a presumption applies. However, the California Supreme Court's decision in *Gutierrez* disapproved of the *Guinn* court's reliance on the structure of section 190.5 to support a conclusion that a presumption should apply. The language and structure of section 1170.126 is not ambiguous as to whether a presumption applies. Section 1170.126 strongly emphasizes the court's duty to evaluate whether "resentencing" would pose an unreasonable risk of danger to public safety. Thus, the statute necessarily implies that the court's finding on this issue is a predicate to the inmate's entitlement to resentencing rather than an issue that comes up only as a possible rebuttal of a presumption. Accordingly, we reject appellant's contention that section 1170.126 establishes a presumption that an eligible inmate is entitled to resentencing.

Appellant also argues that *Romero*, *supra*, 13 Cal.4th 497 is relevant in interpreting section 1170.126. He argues: "Just as the reduction of a third-strike term under *Romero* was an exception to the norm, reserved for 'extraordinary' circumstances,

16

so too is the disqualification of an eligible inmate from the new norm of converting third-strike life sentences to second-strike determinate terms." We disagree.

The Three Strikes law did not provide the trial court with any authority to strike a prior conviction allegation. However, *Romero* held that trial courts retain discretion to strike, in furtherance of justice under section 1385, subdivision (a), prior felony conviction allegations in cases brought under the Three Strikes law. (*Romero*, *supra*, 13 Cal.4th at pp. 529-530.) *People v. Williams* (1998) 17 Cal.4th 148 later clarified that when a trial court exercises its discretion, it "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) Moreover, since the Three Strikes law was intended to restrict trial courts' discretion in sentencing repeat offenders, the California Supreme Court determined that there were "stringent standards" courts must follow in order to find a defendant should be treated as falling outside the Three Strikes scheme. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In contrast to the Three Strikes law, the Reform Act sets out express provisions for when and how a court may exercise its discretion in determining whether an eligible inmate should be resentenced. Since a court's discretionary choice to decline to reduce a sentence is an essential component of the Reform Act, appellant's analogy to the narrow discretion afforded trial courts under *Romero* is unpersuasive.

### B. Right to Jury Trial and Proof Beyond a Reasonable Doubt

Relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), appellant contends that he was deprived of his right to have a jury determine whether he posed an unreasonable risk of danger to public safety beyond a reasonable doubt.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) In *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279 (*Kaulick*), the appellant argued that the prosecution was required to prove " 'unreasonable risk of danger' " under section 1170.126, subdivision (f) beyond a reasonable doubt, because this finding increased the statutory maximum for his offense. (*Kaulick*, at p. 1301.) The Court of Appeal rejected this argument on the ground that the statutory maximum for his offense was always a life sentence. It found that there was no presumption under section 1170.126 that an eligible inmate was entitled to resentencing. Instead, it found that "unreasonable risk of danger" was a "hurdle which must be crossed" before an inmate becomes entitled to resentencing. Thus, an inmate is statutorily subject to his or her Three Strikes term until that hurdle is crossed, making the Three Strikes term the statutory maximum for Sixth Amendment purposes. (*Kaulick*, at pp. 1302-1303.) Since the Sixth Amendment did not apply to the "unreasonable risk of danger" finding, the standard of proof was not beyond a reasonable doubt. (*Id.* at p. 1303.)

Appellant contends that *Kaulick* was "wrongly decided." He focuses on *Kaulick's* reliance on *Dillon v. United States* (2010) 560 U.S. 817, which held that a two-step sentence modification procedure did not implicate the Sixth Amendment. (*Dillon*, at p. 827.) In *Dillon*, the court considered whether a two-step sentence modification procedure implicated the Sixth Amendment. (*Dillon*, at pp. 826-829.) The first step of the procedure was a determination of eligibility and the amount of the potential reduction.

18

If the prisoner was eligible, the second step involved a determination of whether a reduction should be ordered. (*Dillon*, at pp. 826-827.) The court held that such a procedure did not implicate the Sixth Amendment because it did not lead to a "plenary resentencing" proceeding. (*Dillon*, at p. 827.) Since the original sentence remained statutorily authorized, the two-step procedure did not involve a change to the statutory maximum for the offense and therefore did not implicate the Sixth Amendment. (*Dillon*, at pp. 828-829.)

Appellant argues that, unlike the statutory scheme analyzed in *Dillon*, section 1170.126 creates a "statutory presumption for a second-strike determinate sentence, which the court must impose absent a factual finding of dangerousness." However, we have rejected appellant's interpretation that section 1170.126 creates a presumption for reducing an eligible inmate's sentence.

We agree with *Kaulick* and its reliance on *Dillon*. A petition for resentencing under section 1170.126 does not implicate the Sixth Amendment because it does not establish a presumption that an eligible inmate is entitled to resentencing. Since the original Three Strikes sentence remained the statutory maximum for appellant's offense, the Sixth Amendment did not entitle appellant to a jury trial or to application of a standard of proof beyond a reasonable doubt.

### C. Definition of Unreasonable Risk of Danger to Public Safety

Appellant contends that the definition of "unreasonable risk of danger to public safety" enacted in Proposition 47 applies to the present case.[3]

---

[3] This issue is currently pending in the California Supreme Court in *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted Feb. 18, 2015, S223825 and *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted Feb. 18, 2015, S223676.

On November 4, 2014, voters passed Proposition 47, entitled "the Safe Neighborhoods and Schools Act" (SNS Act). It went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).) Proposition 47, as described by the Legislative Analyst, has three aspects: "This measure reduces penalties for certain offenders convicted of *nonserious and nonviolent property and drug crimes.* The measure also allows certain offenders who have been previously convicted of such crimes to apply for reduced sentences. In addition, the measure requires any state savings that result from the measure be spent to support [certain services]." (Voter Information Guide, Gen. Elect. (Nov. 4, 2014) analysis by the Legislative Analyst, p. 35, italics added.) Nowhere in Proposition 47 or the ballot materials provided to the voters regarding it was there any reference to section 1170.126 or the Reform Act. (Voter Information Guide, Gen. Elect. (Nov. 4, 2014) pp. 34–39, 70–74.)

Proposition 47 established procedures for applications for reduced sentences for specified nonserious and nonviolent property and drug crimes by adding section 1170.18. Subdivision (a) of section 1170.18 permits persons convicted of the specified nonserious, nonviolent property and drug felonies to file petitions "request[ing] resentencing . . . ."[4] (§ 1170.18, subd. (a).) Subdivision (b) of section 1170.18 provides that a court that receives such a petition shall resentence the petitioner "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." Like section 1170.126, subdivision (g), section 1170.18, subdivision (b)

---

[4] Section 1170.18, subdivision (a) provides: "A person currently serving a sentence for a conviction, whether by trial or plea, of a felony or felonies who would have been guilty of a misdemeanor under the act that added this section ('this act') had this act been in effect at the time of the offense may petition for a recall of sentence before the trial court that entered the judgment of conviction in his or her case to request resentencing in accordance with Sections 11350, 11357, or 11377 of the Health and Safety Code, or Section 459.5, 473, 476a, 490.2, 496, or 666 of the Penal Code, as those sections have been amended or added by this act."

20

provides that, "[i]n exercising its discretion, the court may consider" the petitioner's criminal history, disciplinary record while incarcerated, and "[a]ny other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).)

Appellant relies on subdivision (c) of section 1170.18, which provides: "*As used throughout this Code,* 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit *a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667.*" (§ 1170.18, subd. (c), italics added.)

The very limited list of "violent felony" offenses set forth in section 667, subdivision (e)(2)(C)(iv) reads: "(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code. [¶] (II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289. [¶] (III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288. [¶] (IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive. [¶] (V) Solicitation to commit murder as defined in Section 653f. [¶] (VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245. [¶] (VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418. [¶] (VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

21

We reject appellant's contention that the restrictive definition of "unreasonable risk of danger to public safety" set forth in subdivision (c) of section 1170.18 now controls the meaning of that phrase as it is used in section 1170.126.

"We recognize the basic principle of statutory and constitutional construction which mandates that courts, in construing a measure, not undertake to rewrite its unambiguous language. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348.) That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body." (*People v. Skinner* (1985) 39 Cal.3d 765, 775 (*Skinner*).) "Whether the use of [a particular word] is, in fact, a drafting error can only be determined by reference to the purpose of the section and the intent of the electorate in adopting it." (*Skinner*, at p. 776.)

We believe that the word "Code" was "erroneously used" in section 1170.18, subdivision (c) rather than the word "Act," to refer to the SNS Act, and therefore this error is properly subjected to "judicial correction." The "purpose" of section 1170.18 and "the intent of the electorate" in enacting it unambiguously demonstrate that the voters did not intend to alter the Reform Act or section 1170.126 in any way or to require the resentencing of any person serving a sentence for a crime *other* than one of the specified nonserious, nonviolent property or drug crimes.

Appellant argues that any reliance on *Skinner* is misplaced, because *Skinner* was an extreme case in which the use of "and" as opposed to "or" would have resulted in a "fundamental, far-reaching change in the law of insanity . . . ." (*Skinner*, *supra*, 39 Cal.3d at pp. 775-777.) We disagree. As discussed below, we are convinced that the electorate did not intend for the definition set forth in section 1170.18 to control in petitions for recall of sentences under section 1170.126.

22

First, because Proposition 47's ballot materials and proposed statutory language contained nothing whatsoever to suggest that Proposition 47 would have any impact on the resentencing of anyone who was serving a sentence for a crime *other* than one of the specified nonserious, nonviolent property or drug crimes, it is inconceivable that voters intended for subdivision (c) of section 1170.18 to severely restrict the ability of a court to reject a resentencing petition under the Reform Act by a person convicted of crimes *other* than one of the specified property or drug crimes and whom the court considered dangerous. The Proposition 47 ballot materials contained no mention of such a possible consequence and the only hint was the use of the word "Code" rather than "Act" in an obscure subdivision of the lengthy proposed act. The ballot materials repeatedly emphasized that the resentencing provisions of Proposition 47, which were contained in section 1170.18, were *limited* to *only* those persons serving sentences for the specified nonserious, nonviolent property or drug crimes.

Second, the timing of Proposition 47 makes an intent to alter the Reform Act illogical. The Reform Act required petitions to be brought within two years unless a court concluded that there was good cause for a late-filed petition. (§ 1170.126, subd. (b).) By the time Proposition 47 took effect, only two days remained in the two-year period for filing a Reform Act petition. No rational voter could have intended to change the rules for Reform Act petitions at the last moment, when nearly all petitions would already have been filed and most of them adjudicated.

Third, the structure and content of section 1170.18 is inconsistent with an intent to apply section 1170.18, subdivision (c)'s definition throughout the entire Penal Code. Subdivision (n) of section 1170.18 provides: "Nothing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling *within the purview of this act.*" (§ 1170.18, subd. (n), italics added.) Applying section 1170.18, subdivision (c)'s definition throughout the Penal Code would necessarily "diminish or

23

abrogate the finality of judgments" in cases, like those subject to the Reform Act, that do not fall "within the purview of" Proposition 47. Appellant's petition under the Reform Act, like most such petitions, seeks to abrogate the finality of a Three Strikes judgment in a case that does not involve one of the specified nonserious, nonviolent property or drug crimes. Thus, under section 1170.18, subdivision (n), "[n]othing" in section 1170.18 was intended to apply to his petition. In addition, the wording of section 1170.18, subdivision (c) is itself inconsistent with an intent to apply it "throughout" the entire Penal Code. It refers to "petitioners" and defines a phrase that appears in only two sections of the Penal Code, section 1170.18 and section 1170.126. If the voters had intended to apply this definition to Reform Act petitions, this phrasing would have been the most roundabout means of doing so. Since the ballot materials made no mention of the Reform Act, we will not ascribe such unreasonable conduct to the voters.

Appellant argues, however, that "[b]efore Proposition 47 was enacted, section 1170.126 provided that the court must resentence an eligible petitioner unless it finds he [or she] poses 'an unreasonable risk of danger to public safety.' What potentially abrogates the finality of a judgment is [the] requirement of resentencing in those cases." As previously discussed, there is no presumption that a petitioner will be resentenced under the Reform Act.

Appellant also contends that there are critical similarities between Propositions 36 and 47, and thus "it makes perfect sense for the voters to define the phrase similarly in both." Not so. Proposition 47 provides a resentencing procedure for individuals who were sentenced as felons for crimes that are now misdemeanors. Proposition 36 provides a resentencing procedure for inmates who have at least two violent or serious felony convictions and are currently serving indeterminate life sentences for a third felony conviction. Thus, the applicable statutes deal with very different types of offenses and levels of punishment. Moreover, the purposes of the Reform Act and the SNS Act are

24

different.  "Although the [Reform] Act 'diluted' the three strikes law somewhat [citation], 'enhancing public safety was a key purpose of the [Reform] Act' [Citation]."  (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1036.)  In contrast, the SNS Act focused on monetary savings, that is "to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs . . . ."  (Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 2, p. 70.)  Accordingly, we reject appellant's contention.

Appellant next argues that the failure to apply the section 1170.18 definition in the present case violates the equal protection clauses of the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art I, § 7, subd.(a)).  He reasons:  "Since Proposition 36 became effective on November 7, 2012, any resentencing petition filed under section 1170.126 is necessarily timely if filed by November 6, 2014.  As noted, Proposition 47, including section 1170.18(c), became effective on November 5, 2014.  Therefore, the definition of 'unreasonable risk of danger to public safety' in section 1170.18(c) necessarily applies to any petition filed under Proposition 36 on or after November 5, 2014."  Appellant's equal protection argument fails, however, because we have construed the definition in Proposition 47 to apply only to those seeking resentencing under the SNS Act.

In sum, section 1170.18, subdivision (c) contains a drafting error that must be judicially corrected.  The word "Code" must be read as "Act."  Under this corrected reading of the statute, there is no support for appellant's position.

25

## D. Retrial on Acquitted Charges

Appellant also contends that the proscription against double jeopardy and principles of collateral estoppel and res judicata barred the court from determining that that he committed the robberies and attempted robbery of which he had been acquitted.

In denying the petition for resentencing, the court considered the charges of which appellant had been acquitted and concluded that he lied under oath when he denied that he committed these charges.

"Double jeopardy precludes reprosecution for an offense of which a defendant has been acquitted or to which jeopardy has otherwise attached. Res judicata gives conclusive effect to a final judgment on the merits in subsequent litigation of the same controversy. Collateral estoppel bars relitigation of an issue decided in a previous proceeding in a different cause of action if '(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; and (2) the previous proceeding resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior proceeding.' [Citations.]" (*People v. Davis* (1995) 10 Cal.4th 463, 514-515, fn. 10.)

Appellant acknowledges that the present case is not a "classic" case of double jeopardy. He argues that it presents the "functional equivalent because [he] was acquitted of the robberies, only to be subjected to a second 'trial' by a different fact finder to determine whether he committed them, and worse, under a lower standard of proof." Appellant also points out that the same parties were involved in his trial and the resentencing hearing, the issue of whether he committed the robberies was the same in both proceedings, and the jury verdict and the court's determination were based on the same evidence.

We first note that "numerous federal and California decisions . . . uniformly hold that a jury verdict acquitting a defendant of a charged offense does *not* constitute a

26

finding that the defendant is factually innocent of the offense or establish that any or all of the specific elements of the offense are not true. [Citations.]" (*In re Coley* (2012) 55 Cal.4th 524, 554.) The fact of an acquittal only establishes that the trier of fact had concluded that the prosecutor had not proved the defendant's guilt beyond a reasonable doubt. (*Id.* at p. 555.)

In our view, a section 1170.126 resentencing hearing is analogous to a probation revocation hearing. In a probation revocation hearing, the trial court must determine "'whether the convicted offender "can be safely allowed to return to and remain in society."'" [Citation.]" (*In re Coughlin* (1976) 16 Cal.3d 52, 57 (*Coughlin*).) Similarly, at issue in the section 1170.126 hearing is whether resentencing an eligible inmate "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) The California Supreme Court has held that a trial court may consider evidence which is insufficient to prove guilt at trial in determining whether to revoke probation as long as it does not rely solely upon the acquitted charges. (*Coughlin*, *supra*, 16 Cal.3d at pp. 58-59.) *Coughlin* reasoned: "To hold otherwise, under some novel application of the doctrines of res judicata or double jeopardy, would have the unfortunate consequence of depriving the decision-making body of information which might be essential to an appropriate disposition of the matter. Although the offender must be protected from undue harassment, the interest of society in preventing a premature release of the offender from confinement deserves equal, perhaps paramount, attention. Only by examining *all* the available evidence may the decision-making body exercise the informed discretion which the Legislature has conferred upon it." (*Id.* at p. 54.) *Coughlin's* analysis applies to the present case. Thus, the court did not err in considering evidence which was insufficient to prove that appellant was guilty of the robberies.

Appellant argues that a probation revocation hearing is different from a resentencing hearing pursuant to section 1170.126, because the trial court has broad

27

discretion to grant or revoke probation. As previously discussed, we have rejected appellant's argument regarding a presumption for resentencing under section 1170.126, thereby limiting a court's discretion.

Appellant next argues that the court's reliance on evidence that an inmate committed crimes of which he or she was acquitted is inconsistent with the intent of the Reform Act. He points out that an inmate's eligibility for resentencing is based on his or her "current" convictions. There is no merit to this argument. Though an inmate's eligibility is based on current convictions under subdivision (e) of section 1170.126, the Reform Act also provides that a court must then exercise its discretion to determine whether a petitioner "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising this discretion, subdivision (g) of section 1170.126 provides that the court may consider, among other things, "[a]ny other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g)(3).)

### E.  Sufficiency of the Evidence

Appellant contends that there was insufficient evidence to support the court's findings, and thus it abused its discretion in concluding that he would pose an unreasonable risk of danger to public safety if released.

Section 1170.126, subdivisions (f) and (g) specifically call for an exercise of the court's discretion in determining whether a prisoner would pose an unreasonable risk of danger to public safety. In exercising this discretion, "the court may consider:  [¶]  (1) The [inmate's] criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes;  [¶]  (2) The [inmate's] disciplinary record and record of rehabilitation while incarcerated; and  [¶]  (3) Any other evidence the court, within its discretion, determines

28

to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

"Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 (*Rodrigues*).) However, a court abuses its discretion when there is no evidence to support its factual findings. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998.)

Appellant argues that there was no rational nexus between his criminal history and a finding of current dangerousness. He first argues that his strike convictions were too remote and "it would frustrate the intent of the electorate if a resentencing determination rested on a static factor." He also argues that these convictions occurred during a four-hour period and he did not "directly injure any of the victims." Thus, he claims that there is no rational nexus between his past behavior and current dangerousness.

Here, the strike convictions occurred on one night 22 years ago. However, this factor is not favorable to appellant, because he did not live a crime-free life either before or after his commission of the strike offenses. Appellant was convicted of several offenses between 1984 and 1992. After appellant committed the strike offenses in 1992, he was either incarcerated and/or committed crimes in several of the 12 years that followed before he was incarcerated on the underlying crimes in this case in 2004. As the court found, appellant was "consistently engaged in criminal conduct when he was not institutionalized." Moreover, appellant's attempt to minimize the facts underlying the strike convictions is not persuasive. Appellant placed two teenagers in great fear of bodily injury when he robbed them at gunpoint and asked his accomplice if he should shoot them. Shortly thereafter, appellant placed a gun against another victim's head and

29

demanded money. The victim jumped from his moving car and suffered injuries to his back and knees and experienced symptoms of posttraumatic stress disorder. Thus, the record supports the court's consideration of appellant's strike convictions in exercising its discretion.[5]

Acknowledging that he has a number of prior convictions, many of which were misdemeanors, appellant claims that these convictions do not show a likelihood of future violence. However, section 1170.126 does not refer to future violence. Instead, it calls for an exercise of the court's discretion in determining whether a prisoner would pose "an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) Appellant's prior convictions involved, among other things, resisting arrest, possession of a switch-blade knife, child endangerment, and driving under the influence. These convictions involved threats to public safety. Moreover, the record established that appellant became depressed when disappointed, turned to drugs and alcohol when depressed, and committed crimes under the influence of drugs and alcohol. Thus, the court properly considered appellant's extensive criminal history when he was not incarcerated in making its determination.

Appellant next focuses on the court's consideration of the charges of which he had been acquitted and its conclusion that he lied under oath when he denied that he committed these charges. As previously discussed, the court properly considered this evidence. Appellant, however, argues that the court would have branded him a liar regardless of whether he admitted that he had committed the robberies, "because it had already made up its mind, and was simply looking for something to use against him."

---

[5]    Appellant argues that there was no evidence to support the court's characterization of the strike convictions as a "series" of robberies, because they involved only two incidents. However, the court immediately qualified its statement by referring to "a short" series. We also note that there were three victims. Thus, there was sufficient evidence to support the court's statement.

However, after appellant testified at the resentencing hearing, the court put the matter over for six months to allow the parties to present additional evidence. The court accepted and considered this new evidence before denying the petition, thus indicating that it had not "already made up its mind."

Appellant also contends that the court failed to credit his significant efforts and accomplishments in prison. The record does not support this contention. The court stated that it "appreciate[d] the conduct of the defendant during his time" in prison. However, the court considered these accomplishments in the context of the "pressures that face him if he's not in an institution." The court was justifiably concerned about appellant's behavior outside of prison, because he minimized his prior criminal conduct and demonstrated his "anger management issues" during the resentencing hearing. Despite several anger management classes and performance as an anger management facilitator in prison, appellant was angry and aggressive in responding to the prosecutor's questions, which were asked in a calm, low-key manner. Appellant asserts that his "not being meek and mild" at the hearing is not evidence of current dangerousness. We disagree. Appellant's inability to control his emotions was an indication of how he would behave in future encounters with authority figures or individuals with whom he did not agree.

Appellant claims that there was no evidence to support the court's finding that he "could not provide any insight into what triggers cause him to 'blow up.'" The court's comment was made in its discussion of appellant's angry and aggressive behavior in responding to the prosecutor's questions. Appellant explained his behavior: "I guess the difference would be I'm probably thinking I'm still at trial. I know how important this -- this setting is here today for me. And I guess I don't . . . want to be presented in a way I was in the past." The court could reasonably conclude that this explanation was inadequate.

31

Appellant contends that the court required "absolute certainty" that he would not relapse. The court stated, "He's an addict, he's got a problem, and we recognize that addicts sometimes fall off the wagon . . . . So when the going gets tough, and it will, then you're going to fall off the wagon, and we're going to be back here." Appellant claims that there is nothing in the record to indicate that he is likely to relapse and thus the court's finding was "at best a hunch." As previously stated, appellant's inability to control his emotions during the hearing indicated how he would respond to stressful events. Thus, the court's statement was not based on speculation, but its observations of appellant's conduct and evidence of his past conduct.[6]

Appellant also contends that the court ignored other factors that are probative of his lack of dangerousness. He refers to his low classification score by the CDCR and the opinions of a minister, a college coordinator, and a psychologist that indicated his low risk and suitability for parole. He also claims that the court failed to consider that his age made him unlikely to reoffend and that he had made realistic plans following his release. However, though the court did not specifically refer to this evidence, it stated that it had considered all of the evidence submitted by the parties. In the absence of any evidence to the contrary, we presume that the court followed the law in performing its duty. (Evid. Code, § 664.)

Here, after considering appellant's strike convictions and trauma to the victims, the commitment offenses, his engagement in criminal conduct when not he was not

---

[6] Appellant claims that after the court questioned him about his crying, it ignored his explanation, that is, he was concerned that the court would not see how much he had accomplished. Appellant argues that his crying was not evidence of dangerousness. However, appellant's crying during the hearing was evidence of his inability to control his emotions when he experienced stress. The court was justifiably concerned about appellant's ability to face challenges outside prison without returning to the use of alcohol and drugs.

institutionalized, his extensive history of substance abuse, his rehabilitation efforts in prison, his minimization of his conduct, and his inability to control his emotions during the hearing, the court found that appellant posed an unreasonable risk of danger to public safety. Based on this record, the court's exercise of its discretion was not "'arbitrary, capricious or patently absurd . . . .'" (*Rodriguez, supra*, 8 Cal.4th at pp. 1124-1125.)

### F. Presentence Credits

Appellant contends, and the Attorney General concedes, that he was entitled to additional presentence custody credits.

When appellant committed his current offenses, presentence custody credits were awarded at the rate of six days for every four days spent in actual custody: one day for each day actually served and two additional days as conduct credits for each four days served. (Former §§ 2900.5, 4019, subd. (f).) A defendant, who has been convicted of a nonviolent third strike and sentenced to an indeterminate term, is entitled to presentence conduct credits under section 4019. (*People v. Duff* (2010) 50 Cal.4th 787, 793.)

When appellant was sentenced, he was given 499 days presentence credit, which included 333 days for actual time and 166 days of conduct credit. However, appellant was taken into custody on May 5, 2004, and sentenced on May 5, 2005. Thus, he was entitled to 548 days presentence credit, which included 366 days for actual time and 182 days of conduct credit. (*People v. Smith* (1989) 211 Cal.App.3d 523, 527 [sentencing court is required "to award credits for all days in custody up to and including the day of sentencing . . . ."] Accordingly, the court is directed to amend the abstract of judgment.

### V. Disposition

The abstract of judgment is ordered modified to reflect presentence credits of 548 days. As modified, the judgment is affirmed.

33

_____
Mihara, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Grover, J.



*People v. Ellis*
H040933

34